# FOR PUBLICATION

FILED & ENTERED

JUN 04 2013

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY nbolte      DEPUTY CLERK

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>**AMERICAN SUZUKI MOTOR CORPORATION,**<br><br>Debtor(s), | Case No.: 8:12-bk-22808-SC<br><br>Chapter 11<br><br>**ORDER AND MEMORANDUM OPINION ON OBJECTION TO PROOF OF CLAIM NO. 520-1 [DOCKET NO. 1383]**<br><br>**DATE:** MAY 29, 2013<br>**TIME:** 9:30 A.M.<br>**CTRM:** 5C<br><br>**CLAIM OBJECTION FILED:** MARCH 29, 2013 AS DK. NO. 1383. |

Before the Court is an Objection to Claim of South Motors Suzuki, Inc. (Proof of Claim No. 520-1 the) (the "Claim Objection") arising from damages resulting from the Debtor's rejection of an executory automobile dealership sales and service agreement.

The Court concludes as follows:

South Motors Suzuki, Inc. ("South Motors") is entitled to compensation for rejection of the Agreement consisting of the lost profits from the sale of the automobile inventory, parts and accessories *in stock at the time of South Motor's tender of the automobile inventory, parts and accessories.* South Motors has already been paid the amounts of the contractual repurchase obligations, and thus nothing is owed further on that account. The lost profits for sales of

automobile inventory, and parts and accessories in stock at the time of the tender are determined to be $21,461.00. South Motors is not entitled to any damages based on lost profits with respect to future sales or services for the reasons set forth within this decision. South Motors is not entitled to any common law breach of contract damages based on fair market value of its Suzuki business for the reasons set forth within this decision.

South Motors is not entitled to receive any damages arising under Florida state law, because (a) the asserted Florida statutes are preempted by the United States Bankruptcy Code (11 U.S.C. § 101 et. seq.) (the "Bankruptcy Code") and (b) even if the Florida statutes were not preempted by federal law, they are not applicable because (i) it would be constitutionally impermissible to retroactively apply Florida Law and (ii) the Agreement is controlled by its California choice of law provision.

The Agreement provides for recovery of attorney fees to prevailing parties. Analyzing the respective positions of the parties, the demands asserted, and payments initially made through the executory contract rejection process, and the results of this claim objection, the Court concludes that the Debtor is the prevailing party in this proceeding, and thus shall be awarded legal fees and costs in its favor and against South Motors in an amount to be determined by further evidentiary presentation.

## FACTS

On November 5, 2012 (the "Petition Date"), American Suzuki Motor Corporation ("ASMC" or the "Debtor") filed its petition under Chapter 11 of Title 11, United States Code (the Bankruptcy Code"). The Debtor was a California corporation organized in 1986 and privately owned by Suzuki Motor Corporation, a Japanese corporation. At the time of the petition date, the Debtor was the sole distributor in the continental United States of Suzuki automobiles, motorcycles, ATVs, and marine outboard engines (collectively "Suzuki Products"). As of the

Petition Date, the Debtor wholesaled the Suzuki Products through three primary business divisions: automotive (the "Automotive Division"), motorcycles and ATV (the "Motorcycles/ATV Division"), and outboard marine motors and related products (the "Marine Division"). During the pre-petition operation of its business, the Debtor purchased Suzuki Products from its non-debtor parent Suzuki Motor Corporation ("SMC"), Suzuki Manufacturing of America Corporation, an affiliate of the Debtor, and certain other non-debtor affiliates. In turn, the Debtor wholesaled most of its inventory through a network of independently owned and unaffiliated dealerships located throughout the continental United States. The dealers then marketed and sold the Suzuki Products to retail customers. As of the Petition Date, there were approximately 220 automotive remaining dealerships, over 900 motorcycle/ATV dealerships, and over 780 outboard marine dealerships.

According to the Debtor's approved Third Amended Disclosure Statement,

The Debtor commenced this chapter 11 case to restructure its Automotive Division. The Automotive Division has recently faced and will continue to face numerous adverse business issues including: (a) declining sales volume and market-share, (b) unfavorable foreign currency exchange rates for products manufactured outside the United States, (c) the high cost associated with growing and maintaining an automotive distribution system in the continental United States, (d) having a limited number of models in its line-up that are being offered to consumers in an already highly competitive automotive market, (e) disproportionally high and increasing compliance costs associated with stringent state and federal automotive regulatory requirements unique to the continental United States market, and (f) existing and potential litigation costs. In the face of these business challenges, the Debtor's efforts to reduce operating costs have proven to be insufficient to meet the rising cost of maintaining a competitive and profitable automobile distribution network in the continental United States.

As part of the Automotive Division restructuring, the Debtor will discontinue new automotive sales after its existing automotive inventory is sold. Certain of its existing automotive dealers will be extended an offer to transition their existing dealerships from new sales to provide only service and parts. Through the service and parts dealers, manufacturer's warranties relating to the Debtor's automobiles will be honored to the extent that has been authorized by the Court as discussed below, and the cost associated with such service will continue to be

reimbursed to the participating dealers as part of the Continuing Business (as
defined below).

*Third Amended Disclosure Statement, Dk. No. 587, p. 45, lines 22-28, through p. 46, lines 1-12.*

Immediately following the Petition Date, the Debtor contacted its approximately 220 remaining automotive dealers, offering to enter into letter agreements and service and parts agreements which would result in resolution of dealer claims. Less than thirty days later, the Debtor had entered into 213 agreements, culminating in the December 21, 2012, approved Auto Dealer Agreements Motion (the "Dealers Agreement Motion"). Since that December 2012 approval, the Court estimates that another six dealers have resolved their claims with the Debtor under the umbrella of the Dealers Agreement Motion or related settlements. That agreement provided, *inter alia*, that the approximate 220 dealers, including South Motors, could have maintained their parts and service dealer status for another eight (8) years, and maintained whatever financial benefits such status would have bestowed on the accepting dealers. South Motors was offered the option to continue as a Suzuki service and parts dealer with the successor owner of the business assets for another eight years, and chose not to participate in that arrangement.

## SOUTH MOTORS' CLAIM AND DEBTOR'S OBJECTION

South Motor's Claim

South Motors was a Suzuki automobile dealer operating under the terms of a 1995 Three Year Dealer Sales and Service Agreement and its Standards Provisions (the "SMS Agreement") with the Debtor.[1]  The Court finds that the SMS Agreement was extended by

[1] The Three Year Dealer and Service Agreement, and its accompanying Standard Provisions, are attached to the Debtor's Objection to the South Motors Claim as exhibits "A" and "D", respectively, and can be found at Dk. No.

letter agreement for one year, through August 15, 1999.[2]  Finally, the parties agree that no

other modifications or alterations were made to the SMS Agreement and that they have been

operating under this agreement since that time.

By Order dated January 11, 2013, the Debtor rejected the SMS Agreement, effective as

of December 20, 2012. South Motors filed its Claim on January 31, 2013, in the amount of

$1,595,601, plus attorney fees and costs, based on certain post-termination obligations arising

under the SMS Agreement and applicable state law (the "Claim").  The Claim is comprised of:

(a) $531,867 under the repurchase categories articulated in the SMS Agreement and various

provisions of the Florida Motor Vehicle Licenses Act (the "Act"), and (b) an additional

$1,063,734, based on South Motors' argument that it is entitled to treble damages under the

Act.  South Motors asserts that "[T]he Florida laws (in question), Fla. Stat. §§ 320.64(36) and

320.697, provide for the calculation of South Motors' base damages claim and, where those

damages are not paid, a trebling of damages and the addition of reasonable attorney's fees."

*South Motors Opposition, Dk. No. 1533, p. 4, lines 1-3.*  South Motors asserts that while

certain of these applicable statutes were enacted after it entered into the 1995 SMS

Agreement, they are retroactive in nature. South Motors also provides the Court with an

extensive analysis of claims damages arising from the Act and its analysis that the Act should

be retroactively applied.

---

1384.  These two documents are also marked as Exhibit "1" and Exhibit "3", respectively, of the jointly submitted marked exhibits which were admitted into evidence during the hearing.

[2] South Motors argued in Court that the one year extension letter was not binding because "South Motors did not sign it."  This Court finds that South Motors did not repudiate the letter and acted at all times, for the next approximate 12 years, under its terms and conditions.  It seems to the Court that South Motors only argues that the letter extension does not apply so that they can then argue that they are entitled to three years of future contract damages, since the initial agreement was three years. No other benefits or detriments exist with respect to South Motors' argument. The Court finds South Motor's argument that the extension letter has no force or effect disingenuous, opportunistic and simply wrong.

South Motors alternatively argues that if the Act does not apply, it is entitled to a common law claim for breach of contract under Florida law.  It states:

> If, for any reason, the Act did not apply to the current circumstances, South Motors would hold a common law claim for breach of contract under Florida law. Pursuant to Section 365(g) of the Bankruptcy Code, "the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease[.]" 11 U.S.C. § 365(g). In Florida, "[i]t is a fundamental principle of contract law that once liability for a contract breach is established, an injured party is entitled as a matter of right to compensatory damages." *MSM Golf, L.L.C. v. Newgent*, 853 So. 2d 1086, 1087 (Fla. Ct. App. 5th Dist. 2003) (holding that a jury verdict that finds that one party breached two contracts but fails to award any damages is inconsistent and cannot stand).

*South Motors Opposition, Dk. No. 1533, p. 6, lines 3-10.*

South Motors finally asserts that it is entitled to reasonable attorney fees and costs pursuant to both the Act and the SMS Agreement contractual provisions. *South Motors Opposition, Dk. No. 1533, p. 16, lines 17-25.*

The Debtor's Claim Objection

The Debtor raises a number of objections to the South Motors' claim. First, the Debtor asserts that any repurchase obligation for inventory was satisfied on March 13, 2013, when the Debtor paid South Motors the amount of $200,898.  Second, the Debtor asserts that the balance of the repurchase obligation asserted by South Motors consists of reimbursement for the fair market value of the dealership as of 12 months before the termination, and that amount is not recoverable because (a) the Florida statutes cited by South Motors were enacted in 2009 and do not retroactively apply to the 1995 SMS Agreement, and (b) this provision of the Act is preempted by the Bankruptcy Code. Third, the Debtor asserts that even if South Motors was entitled to the fair market value of its Suzuki franchise pursuant to Fla Stat. § 320.64(36)(b), the value claimed is grossly inflated. The Debtor asserts that, based on a proper analysis, that amount should be no more than $135,992.  Fourth, the Debtor argues

that there is no basis for treble damages, attorney fees or costs under Florida state law because the Debtor has not violated any provision of the Act.  Even if there were a violation, the Debtor says, there is not an allegation of any pecuniary damages arising from such a violation that might be trebled.

Finally, the Debtor asserts that it is entitled to reasonable attorney fees and costs under provisions of the SMS Agreement.

## DISCUSSION

### The Florida Dealer Statutes are Preempted
### by Section 365 of the Bankruptcy Code

The Ninth Circuit decision *In re Baker & Drake, Inc. (Baker & Drake, Inc. v. Public Service Commission of Nevada)*, 35 F.3d 1348 (9th Cir. 1994), teaches that it is "a familiar and well-established principle that the Supremacy Clause, U.S. Const., Art. VI, cl. 2, invalidates state laws that 'interfere with, or are contrary to,' federal law." *Hillsborough Cty. v. Automated Medical Labs., Inc.,* 471 U.S. 707, 712, 85 L. Ed. 2d 714, 105 S. Ct. 2371 (1985) (quoting *Gibbons v. Ogden*, 22 U.S. 1, 9 Wheat. 1, 211, 6 L. Ed. 23 (1824))." *Baker & Drake*, 35 F. 3d at 1352.   In *Baker & Drake*, a Chapter 11 debtor taxicab company proposed a plan of reorganization which provided that its drivers would become independent contractors instead of employees. The court approved the plan and enjoined the Nevada Public Service Commission from enforcing a Nevada statute requiring drivers to be employees. The District Court reversed the bankruptcy court, holding that the Bankruptcy Code did not preempt the Nevada Statute.  The Ninth Circuit affirmed the District Court's finding of non-preemption,

determining that the specific Nevada statute was a reasonable regulation intended to secure the public convenience and safety.[3]

Guided by *Baker & Drake,* the appropriate analysis for determining preemption is to look first "to the intent and sweep of the federal statute." *Baker & Drake*, 35 F.3d at 1353.  The federal statute's preemptive intent may be express or implied, and with respect to implicit preemption, inference may occur where "the scheme if federal regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary state regulation." *Baker & Drake, supra.*  Drawing from the Supreme Court decisions *Hillsborough County*, 471 U.S. at 713, and *Louisiana Public Serv. Comm'n v. FCC*, 476 U.S. 355, 368-69 (1986), the Ninth Circuit determined that

> Even where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law. Such a conflict arises when "compliance with both federal and state regulations is a physical impossibility," or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Baker & Drake,* 35 F.3d at 1353.

The next step of the *Baker and Drake* analysis is to determine whether the state statute "stands as an obstacle to the accomplishment and execution of the full purposes and objectives" of the Bankruptcy Code, or whether the state statute is designed to protect the public health or safety.  This step was derived by the Ninth Circuit's analysis of two Supreme Court cases, *Perez v. Campbell*, 402 U.S. 637 (1971), and *Midlantic National Bank v. New Jersey Department of Environmental Protection*, 474 U.S. 494 (1986).

In *Perez*, the Supreme Court found that an Arizona statute carved out an exception to the federal discharge provision of the Bankruptcy Act (the bankruptcy law prior to the

---

[3] The Ninth Circuit in *Baker & Drake, Inc.* also confirmed that whether a state statute is preempted is a question of law reviewed de novo, citing *Holman v. Laulo-Rowe Agency*, 994 F.2d 666, 668 (9th Cir. 1993).

enactment of the 1978 Bankruptcy Code), and was thus invalid. The Arizona statute provided that damages arising from accidents involving uninsured motorists were not dischargeable, and, according to the Supreme Court, preemption existed as such a law frustrated the full effectiveness of federal law. *Baker and Drake,* 35 F.3d at 1353, citing *Perez*, 402 U.S. at 652.

In *Midlantic National Bank*, which involved the bankruptcy of a waste oil processor, a chapter 7 trustee wished to quickly abandon two hazardous material contaminated sites faster than an f/1.4 lens pursuant to 11 U.S.C. § 554(a). The City and State of New York, as well as the New Jersey Department of Environmental Protection, objected, asserting that such abandonment would violate local and state laws. The bankruptcy court ordered abandonment; however a divided three member panel of the Third Circuit (taking a direct appeal from the bankruptcy court) reversed, holding that Congress did not intend to preempt all state regulation, but only those grounded on policies which were outweighed by the relevant federal interests. The Supreme Court granted certiorari and affirmed, holding that the Bankruptcy Code did not preempt "a state statute or regulation that is *reasonably designed to protect the public health or safety* from identified hazards." *Midlantic*, 474 U.S. at 507 (emphasis added).

Following examination of these Supreme Court rulings, the Ninth Circuit established an analytical standard as follows:

> As we view these cases, they suggest that federal bankruptcy preemption is more likely (1) where a state statute facially or purposefully carves an exception out of the Bankruptcy Act, or (2) where a state statute is concerned with economic regulation rather than with protecting the public health and safety.

*Baker & Drake,* 35 F.3d at 1353.

A significant body of federal case law exists supporting the view that state laws are preempted when they seek to impair a bankruptcy trustee or debtor from assuming or rejecting executory contracts.  These include decisions arising from automobile distributor bankruptcies

seeking to eliminate dealership agreements through the contract rejection mechanism under

11 U.S.C. § 365.  The most prominent of these decisions, *In re Old Carco LLC (f/k/a Chrysler*

*LLC),* 406 B.R. 180 (S.D.N.Y. 2009), directly addressed the preemption issue arising from the

objections of Chrysler dealers alleging that they would be unduly harmed by the rejection of

their dealership contracts.  The New York dealers in *Old Carco* argued that their contracts

were of a different breed deserving heightened scrutiny in the rejection arena, not unlike

collective bargaining agreements, and that they should be afforded special consideration and

standards for rejection.[4] The dealers promoted their argument of heightened standards for

rejection because of the existence of state statutes designed to protect automobile dealers (the

"Dealer Statutes") or because the loss of a dealership in a community could harm the public.

        The dealers also argued that the Dealer Statutes were not preempted by section 365 of

the Bankruptcy Code.  This question was addressed in *Old Carco*.

> The Dealer Statutes also set forth the rights and remedies of dealers under such
> statutes. Relevant to this case are the rights and remedies related to termination
> of dealership agreements. (footnote omitted.) Rights include statutory waiting and
> notice periods for wind-downs and buy-back requirements for terminations with
> or without cause. Remedies include specific types of damages and
> commencement of legal or administrative proceedings. Consistent with the
> Order, the Court concludes that the Dealer Statutes are preempted by § 365 with
> respect to rejection of the Rejected Agreements. Of course, as with contract
> rejection in general, damages are still calculated according to state law.

*Old Carco* 406 B.R. at 199.

        This Court agrees with *Carco's* analysis, which continued:

> More generally, a bankruptcy court recently held that "Congress enacted [§] 365
> to provide debtors the authority to reject executory contracts. This authority
> preempts state law by virtue of the Supremacy Clause [and] the Bankruptcy
> Clause." *In re City of Vallejo*, 403 B.R. 72, 77 (Bankr. E.D. Cal. 2009). "Where a

---

[4] Whether to assume or reject an executory contract is generally left to the business judgment of the trustee or
debtor in possession. *In re G.I. Indus., Inc.*, 204 F.3d 1276, 1282 (9th Cir. 2000).  The Supreme Court has ruled
that a somewhat higher standard than the business judgment rule applies to collective bargaining agreements
(noting "national labor policies of avoiding labor strife and encouraging collective bargaining" under the National
Labor Relations Act). *NLRB v. Bildisco and Bildisco*, 465 U.S. 513, 523-24 (1984).

state law 'unduly impede[s] the operation of federal bankruptcy policy, the state law [will] have to yield.'" *Id*. (quoting *Perez*, 402 U.S. at 649). (footnote omitted.) Specifically and by no means exclusively, statutory notice or waiting periods of, e.g., 60 or 90 days before termination clearly frustrate § 365's purpose to allow a debtor to reject a contract as soon as the debtor has the court's permission (and there is no waiting period under the Bankruptcy Rules). Buy-back requirements also frustrate § 365's purpose to free a debtor of obligations once the debtor has rejected the contract. Good cause hearings frustrate § 365's purpose of giving a bankruptcy court the authority to determine whether a contract may be assumed or rejected. (footnote omitted.) Strict limitations on grounds for nonperformance frustrate § 365's purpose of allowing a debtor to exercise its business judgment and reject contracts when the debtor determines rejection benefits the estate. (Footnote omitted.) So-called "blocking rights," which impose limitations on the power of automobile manufacturers to relocate dealers or establish new dealerships or modify existing dealerships over a dealer's objection, frustrate § 365's purpose of giving a debtor the power to decide which contracts it will assume and assign or reject by allowing other dealers to restrict that power.

*Id*. at 205-206.

As South Motors points out, the question before the Court today is not one of rejection of an executory contract, but of the measure of damages on account of such rejection. State law is used to measure contract rejection damages; but by state law this Court means the normal, common or statutory law used to measure breach of contract damages. The dealer statutes at play here are designed to adjust, in favor of dealers, the normal, common law or statutory law principles guiding remedies for breach of contract. There are no health or safety policies at work with these statutes; they are enacted to obtain commercial economic adjustments to perceived inequities or imbalances between private parties, and are polemic in nature.[5] As a result, the adjustments and penalties set out in dealer statutes skew the cost of rejection (or breach in non-bankruptcy settings) for the economic benefit of automobile dealers. As such, dealer statutes, by approaching the political/economic leverage from the damages

---

[5] During the hearing, the Court further amplified its point regarding the penalties that are part of these state dealer statutes, and the Court's view that they are designed to dissuade distributors or manufacturers from terminating dealer agreements because of the "piling on" of punitive damages. Obviously enforceable under certain circumstances in non-bankruptcy settings, the overarching principles of bankruptcy law preempt these laws in bankruptcy rejection damages proceedings.

angle, impair debtors' opportunities to avail themselves of the overarching principles of federal

bankruptcy law. While perhaps permissible in non-bankruptcy law settings, federal bankruptcy

law preempts these local and state economic windfalls to dealers when no public health or

safety issues are presented.

The purpose of contract rejection under section 365 is to permit the debtor to receive

the economic benefits necessary for reorganization (which includes liquidation under chapter

11) for the ultimate benefit of the estate and its creditors. State legislatively-imposed buy back

requirements, fair market value awards and treble-damages penalties are superimposed onto

the normal contract damage remedy provisions under state common or statutory law.  While

Florida and many other states believe that their public policy should provide special protections

for the economic interest of local car dealerships, in the area of federal bankruptcy law those

remedies run counter to the federal policy of bankruptcy reorganization and are therefore

preempted.

The Ninth Circuit has squarely addressed this concept within the section 365 rejection

remedies (i.e. damages) context.  Refusing to apply the remedy of specific performance, the

Ninth Circuit held:

> Also, rejection of an executory contract serves two purposes. It relieves the debtor of
> burdensome future obligations while he is trying to recover financially and it constitutes
> a breach of a contract which permits the other party to file a creditor's claim." *In re
> Norquist,* 43 Bankr. 224, 225 (Bankr.E.D.Wash. 1984). Given this purpose, the Fourth
> Circuit recently held that specific performance was not an available relief under section
> 365 because "it would undercut the core purpose of rejection." *Lubrizol Enter., Inc. v.
> Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.),* 756 F.2d 1043,
> 1048 (4th Cir. 1985), *cert. denied*, 475 U.S. 1057, 89 L. Ed. 2d 592, 106 S. Ct. 1285
> (1986).

*In re Rega Properties, Ltd*., 894 F.2d 1136, 1140 (9th Cir. Wash. 1990).

### The Applicable Florida Dealer Statutes
### Are Not Retroactive As To the SMS Agreement

South Motors partially bases its claim on repurchase obligations arising under the

Florida Motor Vehicle Licenses Act.  These include requirements to:

(1) repurchase the dealership at its fair market value pursuant to Fla. Stat. §

320.64(36)(b), which statute became effective on May 28, 2009;

(2) repurchase new Suzuki vehicles, parts and accessories, signs, and special tools,

data processing equipment, and automotive service equipment, pursuant to Fla.

Stat. § 320.64(36)(a), which statute became effective on July 1, 2006; and

(3) reimburse the cost of transporting, handling, packing, storing, and loading any

property subject to repurchase under Fla. Stat. §320.64(36)(a), which statute also

became effective on July 1, 2006.[6]

The Debtor entered into the SMS Agreement with South Motors in 1995, and the last

(and only) extension to the SMS Agreement was entered into in 1999.  No further written

agreements exist.

Regarding the 2009 Florida statute requiring repurchase of a dealership at fair market

value (Fla. Stat. § 320.64(36)(b)), there is no retroactivity provision (i.e. language that asserts

the statutes controls *existing* or future contracts) within the statute.  Under Florida law, statutes

that affect substantive contractual rights are presumed to apply only prospectively to contracts

entered after the date they are enacted. Only in limited situations may a statute may be applied

retroactively to impact pre-existing contracts.

Florida case law has made it clear that when determining whether an enacted statute

(or amendment thereto) can apply retroactively to existing contracts, the Court must determine

---

[6] The relevant legislative histories of these statutes are set out in the Debtor's Objection (Dk. No. 1383) and shall
not be repeated here.

whether there is clear legislative intent to apply the statute retroactively. If there is none, the statute applies only prospectively, and no other constitutional analysis is necessary with respect to existing contracts. *See Trustees of Tufts College v. Triple R. Ranch, Inc.*, 275 So.2d 521 (Fla. 1973); *In re Seven Barrels of Wine*, 79 Fla. 1, 83 So. 627 (1920). The same analysis is used to determine whether amendments to existing statutes can apply retroactively to pre-existing contracts. *Basel v. McFarland & Sons, Inc.*, 815 So.2d 687, 692 (Fla. 5th DCA 2002) (refusing to apply statutory amendment retroactively).

With respect to the statutory requirements to repurchase vehicles, parts and accessories and for the cost of transporting, handling, etc. property subject to repurchase pursuant to Fla. Stat. § 320.64(36)(a), those 2006 amendments contain a retroactivity provision, directing that the statute applies to both existing and future dealership agreements.

The Florida Supreme Court has addressed the retroactive application of the Motor Vehicle Act and had determined retroactive application to existing contracts is impermissible under the Florida and United States Constitutions. *Yamaha Parts Distr., Inc. v. Ehrman*, 316 So.2d 557 (Fla. 1975) (finding that retroactive application of dealer termination statutes to agreements pre-dating its enactment would be unconstitutional); *Dept. of Mot. Veh. v. Mercedez-Benz, Inc.,* 408 So.2d 627, 630 (Fla. 2nd DCA 1981) (finding that retroactive application of dealer transfer restrictions to agreements pre-dating its enactment would be unconstitutional). The Debtor observes, and this Court finds, that while these cases dealt with the retroactive application of the originally-enacted Motor Vehicle Act, later statutory amendments are evaluated in the same way, and retroactive application is forbidden if existing contract rights are disturbed. *See Hassen v. State Farm Mut. Auto Ins. Co.,* 674 So.2d 106 (1996) (refusing to apply statutory amendment retroactively; *Basel v. McFarland & Sons, Inc.*, 815 So.2d 687, 692 (Fla. 5th DCA 2002) (same); *Ellsworth v. Ins. Co.*, 508 So.2d 395 (Fla. 1st

DCA 1987) (same); *Metro. Prop.and Liab. Ins. Co. v. Gray*, 446 So.2d 216 (Fla. 5th DCA 1984)

(same).

The Court also observes that the Attorney General of the State of Florida has issued,

and has never withdrawn, an extensive Attorney General Advisory Legal Opinion AGO 83-47,

dated July 29, 1983, concerning the "Motor Vehicle Warranty Enforcement Act," Ch. 83-69,

Laws of Florida, which reads in pertinent part,

> Further, it is a well-settled rule that a statute will not be construed as retroactive unless its terms clearly show that the Legislature intended such a result. Instead, the presumption is that a legislative act operates prospectively only, unless there is a clear showing of retroactive intent. *See, e.g., State ex rel. Bayless v. Lee*, 23 So.2d 575 (Fla. 1945); *Trustees of Tufts College v. Triple R. Ranch, Inc.*, 275 So.2d 521 (Fla. 1973); *Keystone Water Company v. Bevis*, 278 So.2d 606 (Fla. 1973); *Gulf Pines Memorial Park, Inc. v. Oaklawn Memorial Park Inc.*, 361 So.2d 695 (Fla. 1978); *Seddon v. Harpster*, 403 So.2d 409 (Fla. 1981); *Indemnity Insurance Company v. Brooks-Fisher Insulating Co.*, 140 So.2d 613 (2 D.C.A. Fla., 1962). *See generally 82 C.J.S. Statutes § 414.* As stated in *Heberle v. P.R.O. Liquidating Company*, 186 So.2d 280, 282 (1 D.C.A. Fla., 1966):
>
> > "A law is retroactive or retrospective if it takes away or impairs vested rights acquired under existing laws, or if it creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions or considerations already past." (e.s.)
>
> That the rule against retroactive application is applied in an especially strict manner as to laws imposing new penalties or obligations was noted by the court in *Larson v. Independent Life & Accident Insurance Company*, 29 So.2d 448 (Fla. 1947), wherein it was stated that "[a]cts which create new obligations and impose new penalties, have been more rigidly construed as being governed by this rule." *See also Taylor v. Florida Crimes Compensation Commission*, 367 So.2d 720 (3 D.C.A. Fla., 1979) (the rule that statutes will not be given retroactive application unless such application is required in clear and explicit terms applies to statutes which create new rights and liabilities); AGO 78-22. Compare 15 U.S.C.S. § 2312 (the effective date provision of the Magnuson-Moss Warranty Act which states that, with the exception of one section, the provisions of that Act "shall take effect 6 months after the date of its enactment [enacted January 4, 1975] but shall not apply to consumer products manufactured prior to such date"). An exception to the general rules stated above applies to remedial or procedural statutes which do not create new rights or obligations or enlarge, diminish or destroy vested or contractual rights but only operate in furtherance of the remedy or confirmation of rights already existing; such statutes are generally held to operate retrospectively unless such operation or application would adversely affect substantive rights.

*See 82 C.J.S. Statutes § 416; City of Lakeland v. Catinella*, 129 So.2d 133 (Fla. 1961).

\*\*\*

The obligation of a contract is impaired in the constitutional sense when the substantive rights of the parties to the contract are changed, *Hardware Mutual Casualty Company v. Carlton*, 9 So.2d 359 (Fla. 1942), or where new and different liabilities are imposed thereunder, *Manning v. Travelers Insurance Company*, 250 So.2d 872 (Fla. 1971). As the court stated in *Manning v. Travelers Insurance Company, supra*, "[i]n order for a statute to offend the constitutional prohibition against enactment of laws impairing the obligation of contracts, the statute must have the effect of rewriting antecedent contracts, that is, of changing the substantive rights of the parties to existing contracts." 250 So.2d at 874. *See also Commodore Plaza at Century 21 Condominium Association, Inc. v. Cohen*, 378 So.2d 307, 309 (3 D.C.A. Fla., 1979), in which the court found that the statutory imposition of attorneys' fees pursuant to a legislative enactment effective subsequent to the execution of a ninety-nine year lease in which attorneys' fees were not bargained for materially changed the binding force of the agreement and would impair the obligation of the existing lease and contract between the parties and was unconstitutional as applied to that instrument. *And see Dewberry v. Auto-Owners Insurance Company*, 363 So.2d 1077, 1079-1080 (Fla. 1978), and *Hausler v. State Farm Mutual Automobile Insurance Company*, 374 So.2d 1037, 1038 (2 D.C.A. Fla., 1979) (where statute in question was not in effect at time of contracting, it cannot be retroactively applied to alter obligations of that contract, and this is true even though the act which triggers the obligation occurs after statute is enacted).

*Attorney General Advisory Legal Opinion AGO 83-47*, dated July 29, 1983.

The Court also notes the analysis by the Florida Senate's Professional Staff of the Transportation Committee, set forth in "The Florida Senate Bill Analysis and Fiscal Impact Statement" for SB 740, dated March 3, 2011.  It is both self-explanatory and illuminating:

I. Summary:

Manufacturers, distributors, and importers (collectively referred to as licensees) enter into contractual agreements with franchised motor vehicle dealers to sell particular vehicles that they manufacture, distribute, or import. Existing law provides for the licensing of motor vehicle dealers and motor vehicle manufacturers, distributors, and importers, and regulates numerous aspects of the franchise contracts these businesses enter into to conduct business in the State of Florida.

The Department of Highway Safety and Motor Vehicles (DHSMV) held, in an administrative proceeding, amendments to the Florida Automobile Dealers Act

(§§. 320.60-320.071, F.S.) do not apply to dealers having franchise agreements which were signed prior to the effective date of the amendment. *Motorsports of Delray, LLC v. Yamaha Motor Corp., U.S.A.*, Case No. DMV-09-0935 (Fla. DOAH 2009). The Petitioner appealed the final order to the First District Court of Appeal, but ultimately voluntarily dismissed the appeal. The DHSMV has indicated it will be applying this holding to every amendment to the Florida Automobile Dealers Act. That means dealers have different protections under the law depending on when they signed their franchise agreement.

The bill amends § 320.6992, F.S., to provide for the application of §§ 320.60-320.70, F.S., including any amendments to ss. 320.60-320.70, F.S., to all existing or subsequently established systems of distribution of motor vehicles in the state unless such application would impair valid contractual agreements in violation of the State or Federal Constitution. All agreements amended subsequent to October 1, 1988, are governed by §§ 320.60-320.70, F.S., including any amendments to §§ 320.60-320.70, F.S., which have been or may be from time to time adopted unless the amendment specifically provides otherwise.

\*\*\*

Section 320.6992, F.S., provides this act [Florida Automobile Dealers Act] shall apply to all presently existing or hereafter established systems of distribution of motor vehicles in this state, except to the extent that such application would impair valid contractual agreements in violation of the State Constitution or Federal Constitution. The provisions of this act shall not apply to any judicial or administrative proceeding pending as of October 1, 1988. All agreements renewed or entered into subsequent to October 1, 1988, shall be governed hereby.

**The DHSMV recently held, in an administrative proceeding, amendments to the Florida Automobile Dealers Act do not apply to dealers having franchise agreements which were signed prior to the effective date of the amendment. *Motorsports of Delray, LLC v. Yamaha Motor Corp., U.S.A.*, Case No. DMV-09-0935 (Fla. DOAH 2009). The Petitioner appealed the final order to the First District Court of Appeal, but ultimately voluntarily dismissed the appeal.**

**In this holding, the DHSMV ruled the 2006 amendment to the Florida Automobile Dealers Act which requires that if a dealer's franchise agreement is terminated the manufacturer must buyback from the dealer its unsold vehicles, parts, signs, special tools, and other items, does not apply to a dealer terminated in 2008 because the dealer's franchise agreement was entered into prior to the effective date of the amendment.**

**The DHSMV has indicated it will be applying this holding to every amendment to the Florida Automobile Dealers Act. That means dealers**

**have different protections under the law depending on when they signed their franchise agreement.  (Emphasis added).**

Fla. S. Comm. on Transp. CS for SB 740 (2011) Staff Analysis (Mar. 3, 2011), available at http://www.flsenate.gov/Session/Bill/2011/0740/Analyses/=PL=vG/aZPamDkEYlJgyh4VVoOS39E=%7C7/Public/Bills/0700-0799/0740/Analysis/2011s0740.pre.tr.PDF.

This Court has reviewed the *Motorsports of Delray, LLC v. Yamaha Motor Corp., U.S.A.*, decision and finds it persuasive.  See *Motorsports of Delray, LLC v. Yamaha Motor Corp., U.S.A.*, Case No. DMV-09-0935 (Fla. DOAH 2009).  The final order in *Motorsports of Delray* adopted the recommended order as its final order.  The recommended order adopted the undisputed material facts and analysis of the Administrative law judge.  That Court entered an order "i) granting Yamaha's Motion, ii) finding that there are no disputed material facts; iii) ruling that the buyback provision in section 320.64(26), Florida Statutes, is prospective only; and iv) relinquishing jurisdiction to the Department pursuant to section 120.57(1)(i), Florida Statutes…The undisputed material facts and analysis as stated in the Administrative Law Judge's Order Relinquishing Jurisdiction are adopted herein and made a part of this Recommended Order." *Motorsports of Delray, LLC v. Yamaha Motor Corp., U.S.A.*, Case No. DMV-09-0935 (Fla. DOAH 2009).

Because the SMS Agreement was entered into in 1995 and extended through 1999, any application of the Act, as amended, to South Motors' claim would be retroactive in nature. The Act is not applicable in the case of the fair market value buy-back provisions, and as to all of the Act's pertinent provisions, whether they include retroactive language or not, they unconstitutionally impair the Debtor's contract rights contained in the SMS Agreement, and are therefore unenforceable.

## South Motors is Entitled to Breach of Contract Damages
## Under the Terms of the SMS Agreement

<u>Termination Obligations Under the Dealer Agreement</u>

Section 11.07 of the Standard Provisions of the operative SMS Agreement provides as follows:

> Suzuki Repurchase Option Upon Termination. Upon termination of this Agreement for any reason, Suzuki will repurchase from Dealer, free and clear of all liens, charges and encumbrances, the following:
>
> a. New, unused, unaltered, undamaged, unlicensed and marketable current model Suzuki Vehicles, with mileage of 100 miles or less, which were purchased by Dealer from Suzuki, and are in Dealer's inventory, at Dealer's vehicle price less destination charges and any voluntary advertising associated assessments made on behalf of a Suzuki Advertising Association. Suzuki shall pick up said Suzuki Vehicles and pay all transportation charges for return of said vehicles; and
>
> b. The new, current model Suzuki Parts and Accessories at Suzuki's invoice price to dealer, less Suzuki's prevailing restocking charge, but only if delivered by Dealer at Dealer's expense, to Suzuki's Parts Warehouse located nearest Dealer provided, however, that these Suzuki Parts and Accessories must be in a new, unused, undamaged and saleable condition and in the original package and original package quality; provided further, that Suzuki will not purchase any Suzuki Parts and Accessories which Suzuki deems to be obsolete.

Dealer Sales and Service Agreement Standard Provisions (April 1990), Debtor's Appx., Ex. D. [Dk. No. 1384].

The Court's first inquiry is whether this provision is the appropriate breach of contract damages afforded South Motors because of contract rejection under § 365.[7]  These provisions

---

[7] Executory contract rejection under § 365 does not automatically terminate the contract. The contract is breached by the trustee/debtor in possession, but the contract is terminated by the innocent party.  In this case, South Motors terminated the contract when it tendered its rolling stock inventory, parts and accessories. This distinction has been the subject of a multitude of decisions and amplified in *CASC Corp. v. Milner (In re Locke)*, 180 B.R. 245, 259 (Bankr. C.D. Cal. 1995) (J. Zurzolo).  Relying on *In re Austin Development Co.,* 19 F.3d 1077 (5th Cir. 1994), *Locke* explained:

> Further, Congress knew how to authorize the termination of executory contracts and leases in § 365. 'Termination' is used in § 365(h)(i) and (n) as one option available respectively to the purchaser of an interest in a time share project,  the vendee of real property, or the licensee from the debtor of a right to intellectual property if the trustee has rejected the executory contract. Accordingly, the trustee may reject any of these contracts, but termination does not occur except

of the SMS Agreement might be relevant as a measure of damages for breach of contract by

the Debtor, as they are contract provisions agreed to at the beginning of the distributor-dealer

relationship between the Debtor and South Motors to guide the economic unwinding of the

relationship when the SMS Agreement is terminated by the Debtor. Although not called

"liquidated damages" within the SMS Agreement, this is a classic example of parties pre-

determining the final economic results of a concluded contractual arrangement. On the other

hand, just as statutory damages provided under the Florida Motor Vehicle Act tend to skew the

economic outcomes of contract rejection and are thus preempted, liquidated damage

provisions within contracts may also adversely impact the federal policy of executory contract

rejection under § 365.  Some cases have permitted a court to consider liquidated damage

provisions, while others have not permitted such consideration. One article addresses the

matter as follows:

> In the liquidated damages context, the scenario changes slightly. Although one
> would think that a liquidated damages provision - negotiated by the parties as
> part of a complex process of give-and-take - would simply constitute one of the
> many burdens and benefits of a contract, courts have treated such clauses in
> differing manners in the rejection context. Professor Andrew criticized some
> courts' treatment of liquidated damages provisions, (footnote omitted) arguing
> that liquidated damages provisions should remain enforceable. It was not clear
> from Andrew's article whether he meant that courts should grant non-debtor
> parties "specific performance" of liquidated damages provision or whether the
> value of the non-debtor's unsecured rejection damages claim should be
> calculated using the liquidating damages clause of the rejected contract (footnote
> omitted). The former proposition is clearly erroneous, and it is not clear that the
> latter proposition fares any better. First, if courts are to enforce liquidated
> damages provisions, what advantage would the debtor even gain by rejecting
> any of those numerous contracts that in fact contain such liquidated damages

---

at the other party's option. The option to terminate a time share lease, § 365(h)(i), or a license §
365(n)(1)(A), arises where the trustee's rejection 'amounts to such a breach as would entitle the
[party] to treat such lease or [contract] as terminated by virtue of its own term, applicable non-
bankruptcy law or other agreements…'" Under an objective reading, the provisions of § 365 may
be redundant and complex, but Congress was not confused in its differing usages of the terms
rejection, breach and termination. *Austin Development* at 1081-83.

*CASC Corp. v. Milner (In re Locke),* 180 B.R. 245, 259 (Bankr. C.D. Cal. 1995).

provisions? As one court has stated: "If liquidated damages clauses were enforceable, there would be no reason for rejection of the contract by the debtor." *In re Ei Int'l*, 123 B.R. 64 (Bankr. D. Idaho 1991). Second, enforcing a burdensome and perhaps penalty-imposing liquidated damages clause contradicts the "broad purpose of Chapter 11": facilitating "successful rehabilitation of debtors." (footnote omitted). In the interests of equity, courts should grant damages in only the amount of harm the debtor caused. (footnote omitted). Enforcing liquidated damages provisions merely in the name of state law comity (footnote omitted) serves only to unnecessarily enrich an individual non-debtor at the expense of the underlying estate.

Pickerell, Carl N., *Executory Contracts Re-Revisited*, 83 Am. Bankr. L.J. 63, 91-92 (2009).

This Court believes that the correct general practice is to utilize traditional breach of damage calculations, and when appropriate, liquidated damages provisions, if on occasion liquidated damages provisions assist the Court in determining the proper damages, so much the better.[8]

Breach of Contract Damages

"The question of the measure and amount of damages for wrongful termination of automobile dealership contracts has been complicated by the varying contractual provisions, problems relating to proof and certainty, and the fact that the majority of cases on the subject date from the early days of automobiles when the future of the industry was uncertain, dealer investments were low, and the great disparity in bargaining power between the dealer and manufacturer had not yet developed."  Joseph T. Bockrath, J. D., *Damages for Wrongful Termination of Automobile Dealership Contracts*, 54 A.L.R.3d 324, 2a.

---

[8] The unpublished (and thus non-precedential) Ninth Circuit's decision in *In re Dailey*, 1994 U.S. App. LEXIS 3890 (9th Cir. Feb. 24, 1994) takes another view about liquidated damage provisions in rejected contracts. Overturning a bankruptcy court's decision of ignoring contract termination provisions, the Ninth Circuit held "[t]he gist of the bankruptcy court's treatment of this issue is that rejection means termination and, since a terminated agreement cannot provide guidance to a court, the bankruptcy court was free to ignore the lease's liquidated damages clause and choice of law provision. We disagree. The lease was merely breached, not rescinded or declared void ab initio, and there is nothing in 11 U.S.C. §§ 365(g) or 502(g) that prohibits a court from examining the terms of the parties' agreement to determine the amount of damages due the nonbreaching party or the law applicable thereto. As there is nothing in the lease's formula for calculating damages that runs afoul of the Bankruptcy Code, and there was nothing improper in the parties' selection of Washington law (footnote omitted), we hold that the bankruptcy court erred by ignoring the lease's damage calculation formula and choice of law provision." *Mercedes-Benz Credit Corp. v. Dailey (In re Dailey)*, 1994 U.S. App. LEXIS 3890 (9th Cir. Feb. 24, 1994).

Loss of future profits is the method most often used to determine damages from a wrongful termination of a contract.  See, Joseph T. Bockrath, Annotation, *Damages for Wrongful Termination of Automobile Dealership Contracts,* 54 A.L.R.3d 324, 4.[9] (citing *Volkswagen Interamericana, S. A. v. Rohlsen*, 360 F.2d 437 (1st Cir. 1966), cert. den. 385 US 919; *Moon Motor Car Co. v. Moon Motor Car Co.*, 29 F.2d 3 (2nd Cir. 1928); *Garvin v. American Motors Sales Corp.* 202 F. Supp 667, (D.C.Pa. 1962), rev'd. on issue of liability 318 F.2d 518 (3rd Cir. 1962); *Chevrolet Motor Co. v. Gladding* 42 F.2d 440 (4th Cir. 1930), cert. den. 282 U.S. 872; *Chevrolet Motor Co. v. McCullough Motor Co.* 6 F.2d 212 (9th Cir. 1925); *American Motors Sales Corp. v. Semke* 384 F.2d 192 (10th Cir. 1967)).

The A.L.R. 3d analysis of future profit awards continues:

The determination of what constitutes "future profits" has been inconsistent. The inconsistency stems partly from the fact that in some cases the contract is terminable at will, while in others it has a set period. Some cases hold that the prospective profits can be awarded for no further into the future than the term of the contract. (Footnote omitted). In one case, it was said that the notice period was the furthest into the future that damages could be projected. (Footnote omitted). Cases arising under the Automobile Dealers' Fair Day in Court Act, (footnote omitted) however, indicate that the contrary is true and expressly hold that there is no basis to limit damages to a single year. (Footnote omitted). In a few early cases, recovery was allowed only for prospective profits on cars already ordered at the time of the termination, and one case held that recovery might be had only for cars on order for which the dealer had binding purchase orders. (Footnote omitted). In one situation, where the dealership contract was terminable at will and the manufacturer was under no obligation to supply vehicles, it was held that damages must be based on proof of how many cars the manufacturer would have supplied voluntarily. (Footnote omitted).

54 A.L.R.3d 324, 2a.

Several cases, *Chevrolet Motor Co. v Gladding*, *supra*, and *Chevrolet Motor Co. v McCullough Motor Co., supra,* have determined that where recovery was sought for a wrongful

---

[9] The Court particularly enjoyed reviewing the 1912 decision in *Isbell v Anderson Carriage Co.* (1912) 170 Mich 304, 136 NW 457, where the court found that the automobile business was too competitive and speculative for future profits to be awarded.

termination of an auto dealership contract, and in which a "future profits" measure of damages was adopted, the "future" was limited to the period of the dealership contract.

An alternative method for measuring damages for the wrongful termination of an automobile dealership franchise is the value of the franchise at the time of the termination. "Although no cases rule directly that this measure should be applied, its use has been approved by implication."  Joseph T. Bockrath, J. D., *Damages for Wrongful Termination of Automobile Dealership Contracts,* 54 A.L.R.3d 324, 2a *(citing Volkswagen Interamericana, S. A. v Rohlsen*, 360 F.2d 437 (1st Cir. 1966), cert. den. 385 U.S. 919.)   In reviewing *Volkswagen Interamericana*, this Court finds it to be a very thin implication, justifying A.L.R.'s comment that no cases have ever directly ruled on this measure.  Indeed, this Court has found none.

The Court has heard from three expert witnesses in this matter.  The first was Mr. John W. Forehand, in house counsel to "South Motor Company of Dade County".  His testimony consisted of his opinion of the fair market value (the "FMV") of South Motors as of October 31, 2011.  He testified that this particular date was selected based upon his interpretation of property damages provided by Florida statute. No effort to value South Motors on the Petition Date, at the time of (or the effective date of) the rejection of the executory contact, or any date perceived by South Motors as the date of termination of the contract, was undertaken by Mr. Forehand.  Mr. Forehand opined that the value of the business on October 31, 2011 was $330,000.00.

While the Court declared Mr. Forehand as an expert for purposes of valuation of car dealerships during the initial portions of the hearing, the Court also noted that it would be determining the weight to be given to his FMV analysis.  Based on his Declaration, his testimony during cross-examination and re-direct examination, as well as responses to

questions directly poised by the Court, the Court finds that Mr. Forehand's valuation opinion is

neither temporally nor substantively significant so as to allow the Court to grant any weight at

all to the valuation.  The opinion of $330,000 value was based upon stale and significantly

incomplete financial information and lacked true economic analysis that would be utilized in an

actual valuation or sales transaction.  For instance, Mr. Forehand never attempted to allocate

significant and accurate operations costs to his valuation, since most of the operational costs

of the Suzuki portions of South Motor's business operations were subsidized by other

automobile line businesses.  Simply put, as the Court hears the testimony and evidence, it is

as likely as not that South Motors' Suzuki sales and service operations would have lost money

all of the years analyzed by Mr. Forehand had the other automobile line operations not been

subsidizing the Suzuki operations.  Further, Mr. Forehand's own testimony clearly implied that

his activities, skills, experience and analysis were quite similar to a real estate broker or agent

undertaking determination of an appropriate "listing price" for a home being put on the market.

He had no information on South Motors sales for 2012 or 2013 at his disposal for purposes of

his analysis, and he undertook no effort to acquire such information.  No meaningful weight

can be given to Mr. Forehand's valuation, and the Court declines to do so.

On a bright note, Mr. Forehand testified that in 2011, the "average" profits from sales of

new Suzuki automobiles (69 that year) were approximately $531.00 per vehicle.  Mr. Forehand

also confirmed to the Court that eight (8) automobiles were repurchased by the Debtor at the

time of the tender.  Finally, Mr. Forehand testified that with respect to the parts and

accessories sales, typical profit margins were between 65% and 70%.  The Court has no

problem adopting this testimony, and does so later in its own calculations.

A second valuation expert was offered by South Motors, Mr. Joseph Roesner.  Mr.

Roesner provided the Court with testimony concerning loss of profits based solely on the parts

and service sales for South Motors over a period running through March 2016. His testimony

brought out that the South Motors new sales component of business brought little or no net

profit to South Motors.  His analysis was based solely on parts and service sales for the period

of December, 2013 through March, 2016 (which was a period requested by South Motors and

based on the original three year sales and service contract and not the one year extension).

Mr. Roesner's opinion was that the loss of profits for a three and a half year period was

$294,242.  Within his declaration and on cross-examination, Mr. Roesner explained that his

conclusion of lost profits amounts was based, first, on a regression analysis of South Motors

gross sales and service profits from January 2009 through November 2011, demonstrating a

decline of sales and services net profits, combined with a view of the the average yearly

service and parts gross profits for years 2009 through 2012 minus the average "Service and

Parts Incremental Expenses" that were provided to him by South Motors. These, he opined,

resulted in his net profit calculation of $121,043.00.  He then multiplied this amount by

approximately 3.5 years (three years from the contract rejection date) to find lost profits of

$295,242.00.

On cross-examination, Mr. Roesner agreed that he did not calculate the incremental

expenses figure, and those were simply given to him by South Motors.  He further explained

that had he not been provided those numbers, he would have used instead an industry

standard as the appropriate number, which would have been significantly higher.  Had he used

the industry standard, he explained, his calculation of net lost profits would have been

approximately $220,000.00 and not $295,242.00.  Rebuttal from Debtor's expert witness

Herbert E. Walter, raised doubt regarding Mr. Roesner's methodology, including the

"regression" analysis, with respect to its use, relevancy and meaning.  The "incremental

expenses" used by Mr. Roesner were also challenged by Mr. Walter, who explained that these

stated expenses severely understated the true expenses being incurred by South Motor, especially in light of South Motor's other divisions' subsidy of South Motors (Suzuki) operations.

The Court has its own concerns regarding this testimony and analysis.  It appears the South Motors business carries parts and repairs a large variety of vehicle brands, and they might just as easily be able to redirect the work that would have gone into stocking Suzuki parts and repairing Suzuki vehicles to stocking other brands and repairing other vehicles, and make up the lost business. *They also are at liberty to contact the new distributor of Suzuki parts and enter into a new agreement.*  They can also buy Suzuki parts from other dealers.[10] Is South Motors going to have mechanics just sitting around not performing work?  If so, this means they would terminate their employment, which could be a savings associated with not having to pay their wages.  None of these considerations were presented to the Court.

The issue of mitigation was not considered by Mr. Roesner, and only briefly touched on by South Motors within its arguments. Had South Motors mitigated its damages by entering into the initially offered eight year parts and service agreement offered (as 97% of the other dealers did), no lost profits, assuming any, could have existed.[11]  Also, as earlier discussed, there is no evidence that South Motors attempted to enter into a new sales and service agreement with the new distributor.

---

[10] While the Court places no special emphasis on it, the Court was surprised to hear Mr. Roesner's testimony that South Motor would have been required to pay rack prices for parts from other Suzuki distributors. It is common knowledge that dealers have reciprocity arrangements with other dealers regarding parts.  For instance, a Suzuki parts dealer today may need a VW part which South Motors has in stock. These trade of parts for a very small markup is a common occurrence.

[11] Counsel for South Motors expressed at the hearing that legal fees for prosecution of its claim and claim defense is currently over $200,000.00.  The Court compares and places this amount into the context of South Motors' assertions of its "best" estimates of FMV and lost profits by the rejection of the sales and service agreement.

This Court finds that the methodology and calculations presented by Mr. Roesner are not completely sound and little weight can be placed on his opinion of lost profits. The Court also finds that the rationale for the 3.5 year multiplier of the estimated average lost profits (which the Court does not accept as accurate) is without support. Ultimately, however, the Court holds that lost profits for future sales and services are not recoverable at all because South Motors had voluntarily rejected the opportunity to continue as a Suzuki Sales and Servicing dealer for another eight (8) years by the specific offer made early in this case to each and every Suzuki dealer. The Court notes that 97% of all of the Suzuki Dealers agreed to continue operating in the parts and services business with the successor to the Debtor. The irony is not lost on this Court that had South Motors accepted this offer, or had negotiated a new parts and service agreement with the current distributor, any "lost profits", calculable or not at this time, would not be at issue. Little or nothing would have changed for South Motors in that instance.

Finally, the Debtor offered Herbert Walter as an expert as to the fair market value of South Motors' "good will" "immediately preceding Suzuki's bankruptcy filing…". During cross-examination and re-direct examination, the Court reviewed Mr. Walter's calculus for determining the described value of "good will" and learned from him that he knew of no other economist or business valuation expert that had utilized his self-designed methodology. He explained to the Court that the methodology for valuation of South Motors' business was new and innovative and that he knew of no previous valuation of an automobile dealership that had utilized his methodology. The Court finds that Mr. Walter's methodology is unpersuasive and too innovative and new to be given any weight. The Court, reviewing Mr. Walter's credentials, has no doubt of his expertise, and continues to believe he is an expert qualified in the areas

required in this case.  However, under the standards of consideration of expert testimony, the Court can give no weight to the valuation range provided by Mr. Walter.

That said, during the hearing, the Court explained that it was reversing its decision to overrule the Motion to Strike Mr. Walter's declaration, in order to dismiss the valuation presented within his testimony.  That motion was partially based on allegations that he was not an expert. This in-court statement (of reversing the decision to overrule the Motion) was a mistake, a regrettable overstatement and a self-mischaracterization of the Court's desired position, which the Court regrets making.  Mr. Walter is a qualified expert in the field, and only his valuation method was discounted by the Court.[12]  Instead of being discounted as an expert, no weight has been given to Mr. Walter's valuation testimony because it is new, innovative, not peer-reviewed and untested.  Therefore, the Court was intending to reverse its own earlier decision overruling a Motion to Strike Mr. Walter's testimony only as to fair market value of the South Motors' dealership.  Mr. Walter's service as a expert rebuttal witness to address matters raised by South Motor's experts was appropriate. The Court must finally note that the presented rebuttal testimony was limited and not particularly helpful or useful in the Court's factual determinations made today.

The Appropriate Measure and Time of Measure of Damages

On January 11, 2013, an order was entered by this Court authorizing the Debtor to reject the SMS Agreement pursuant to § 365.  This action created a breach of contract by the Debtor. South Motors and the Debtor agree that following the rejection, South Motors tendered its inventory, parts and tools to the Debtor and the Debtor paid South Motors the amounts due. That tender occurred on or about March 13, 2013, which this Court considers the date of notice of termination by South Motors.  The Suzuki Dealers Sales and Service Standard

---

[12] "This is the operative statement. The others are inoperative." Ziegler, Ronald, April 17, 1973.

Provisions, which is part of the SMS Agreement, states that a dealer may terminate the

agreement "by serving thirty (30) day's written notice of termination on Suzuki." § 11.01.

At the time of the tender, the value of inventory held by South Motors (according to

South Motors' Proof of Claim) was $210,250.00, and is broken down as follows:

Automobiles – $162,985.00.  These amounts have been paid to South Motors.

Parts and accessories– $24,590.00.  These amounts have been paid to South Motors.

Special tools and data processing equipment – $22,675.00.  These amounts have been

paid to South Motors.

This Court finds that the lost profit from lost sales of those eight automobiles was

$4,248.00, based on evidence presented of the per sold automobile gross profit in 2011.

($531.00 times eight cars equals $4,248.00). This amount is on the very high (i.e. generous)

side, since other evidence offered by South Motors was that little or no net profits were actually

generated by new Suzuki automobile sales, and takes into account few expenses.  Further,

based on the amount that was paid to South Motors for all of the parts and accessories

($24,590.00), the lost profits from the parts and accessories equals $17,213.00, which is a

70% gross profit.  This is based on the highest amount opined by South Motor's own expert.

There is no "profit" attributable to the repurchase of special tools and data processing

equipment, as they were not resold by South Motors.

The case *Martin v. U-Haul Co. of Fresno*, 204 Cal. App. 3d 396, 408-409 (Cal. App. 5th

Dist. 1988), thoroughly discusses the measure of breach of contract damages when the

contract provides for a notice period of termination.

In *Martin*, the court said

…[t]he Pecarovich court cites several out-of-state authorities for the proposition
that the contract damages are limited to the notice period. (*Pecarovich v. Becker*,
supra, 113 Cal.App.2d at 318.)

As one of those cases explained within the context of an employment contract, "If the employer has the unconditional right to terminate the contract of employment after certain notice, discharge has the effect of notice to terminate and damages are allowed only up to the time the contract would have terminated if notice had been given." (*Bitterman v. Gluck* (1939) 256 App.Div. 336 [9 N.Y.S.2d 1007, 1008].)

In *Cline v. Smith* (1929) 96 Cal.App. 697 [274 P. 761], the court reached a similar conclusion. There a contract which had eight years to run was breached. The trial court had instructed the jury that, in arriving at proper measure of damages, it could consider the fact that the contract had eight years to run. The contract provided that "'either party may terminate this contract at any time by giving to the other party sixty days notice of its intention to do so.'" (*Id.* at p. 699.) The Court of Appeal reversed. It held that the portion of the instruction permitting consideration of the fact that the contract had eight years to run was prejudicially erroneous "[in] view of the company's right to terminate the contract at any time on sixty days' notice . . . ." (*Id.* at p. 702.) Therefore, although not expressly restricting damages to a 60-day period, it implied that that would be the proper measure and did explicitly find that permitting damages based on the total unexpired term of the contract was erroneous in light of the termination provision.

In the venerable case of *Jewell v. Colonial Theater Co.* (1910) 12 Cal.App. 681 [108 P. 527], a contract for the employment of an actress contained a provision stating, "'This contract may be cancelled at any time after the first performance by either party giving two weeks' notice in writing to the other.'" (*Id.* at p. 683.) Before the expiration of the plaintiff's contract, the theater closed, and she was dismissed without receiving the required two weeks' notice. The appellate court found that she was properly awarded her salary for the two-week period following her discharge as part of her damages. ( Id. at p. 684.)

California Civil Code section 3300 provides for the general measure of damages for a breach of contract. It reads: "For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom."

California case law has long held the correct measure of damages to be as follows: "Damages are awarded in an action for breach of contract to give the injured party the benefit of his bargain and insofar as possible to place him in the same position he would have been in had the promisor performed the contract. [Citations.] Damages must be reasonable, however, and the promisor is not required to compensate the injured party for injuries that he had no reason to foresee as the probable result of his breach when he made the contract. [Citations.]" (*Coughlin v. Blair* (1953) 41 Cal.2d 587, 603 [262 P.2d 305]; *accord Glendale Fed. Sav. & Loan Assn. v. Marina View Heights Dev. Co.* (1977) 66

Cal.App.3d 101, 123 [135 Cal.Rptr. 802]; *Bravo v. Buelow* (1985) 168 Cal.App.3d 208, 215 [214 Cal.Rptr. 65].)

Witkin explains the "foreseeability" rule when he states: "The requirement of knowledge or notice as a prerequisite to the recovery of special damages is based on the theory that a party does not and cannot assume limitless responsibility for all consequences of a breach, and that at the time of contracting he must be advised of the facts concerning special harm which might result therefrom, in order that he may determine whether or not to accept the risk of contracting." (1 *Witkin, Summary of Cal. Law* (9th ed. 1987) § 815, p. 733, original italics.)

The specific rule that a termination clause limits recoverable damages to the notice period is consistent with the general requirement that contract damages are limited to those foreseeable by the parties at the time of contracting. Parties who agree that a contract may be terminated for any reason, or no reason, upon the giving of the specified notice could not reasonably anticipate that damages could exceed that notice period.

*Martin v. U-Haul Co. of Fresno*, 204 Cal. App. 3d 396, 408-409 (Cal. App. 5th Dist. 1988).

The notice of "termination" of the SMS Agreement could be considered several dates, including the Petition Date, the Rejection Date, or the Rejection Application Date. It really does not matter in this instance, since the inventory, parts and accessories and tools all had a fixed amount on the date of the tender.  Further, the issue of whether the "contract" between the Debtor and South Motors had no time remaining on its term, one year remaining, or three years remaining, can be parsed out in all directions, with all manner of metaphysical analyses and results arising.  It does not matter in this instance.  No credible evidence of any fair market value of the South Motors dealership business was presented to the Court, and the fact is, since new Suzuki-manufactured cars are no longer available in this country now, a Suzuki car sales dealership is almost valueless.  Further, in this case, no credible evidence exists as to any lost profits of future sales or service.[13]

---

[13] The Debtor correctly asserts that the Force Majeure provision contained in the SMS Agreement Standard Provisions (§ 3.13) limits its liability when it cannot deliver inventory due to discontinuance of sales of Suzuki Products ordered or curtailment of production due to economic or trade conditions or for any cause beyond the

Addressing South Motors' argument that it is entitled to three and a half years of lost

profits, because the Letter Extension was not signed by South Motors, or even the concept

that any future profits should be used as a measure, the Ninth Circuit has rejected that notion.

> Similarly, allowing recovery of the contract price would also undercut the purpose of
> rejection under section 365. As the district court pointed out in its memorandum
> decision, "if the Court were to accept the argument made by the Dunkleys, that is that
> they were entitled to the balance due on the contract, presumptively in cash, what point
> would there be to a rejection of an executory contract under 11 U.S.C. § 365?" *Dunkley
> v. Rega Properties, Ltd. (In re Rega Properties, Ltd.)*, No. C-87-719 RJM, slip op. at 5-6
> (E.D.Wa.Sept. 13, 1988).

*In re Rega Properties, Ltd.,* 894 F.2d 1136, 1141 (9th Cir. Wash. 1990).

The *Martin* decision sums up the views of this Court on the California law[14] and damage

calculations that apply in this instance.  The lost profits from the value of the inventory, parts

and accessories, as defined under the SMS Agreement on hand at the time of the tender are

the correct measure of breach of contract damages.

**Attorney Fees To Be Awarded
Under the SMS Agreement**

South Motors' claim includes amounts owed for attorney fees and costs, based on

Florida statutes and the SMS Agreement. It asserts

> As noted above, Section 320.697 of the Act provides for an automobile dealer
> such as South Motors to recover attorneys' fees in addition to its actual damages
> and treble damages in connection with a violation of the Act. See FLA. STAT. §

---

Debtor's control. How could any lost future profits, or fair market value, be considered with such a liability-limiting provision in force?  South Motors made no significant effort to explain away the application of this provision.

[14] Mr. Justice Traynor once asked how it came about that "the plot got so thick when the mystery was so thin" in the mystery play we like to call "the choice of law."' Ehrenzweig, Albert A., Choice of Law: Current Doctrine and True Rules, 49 Cal. L. Rev. 240 (1961). The SMS Agreement provides that the choice of law for all issues arising under the agreement is California. The Ninth Circuit is clear that renvoi is generally dead-letter, and that only the substantive law of the selected state law, and not procedural matters such as renvoi, is operative.  *Chan v. Society Expeditions*, 123 F.3d 1287, 1297 (9th Cir. Wash. 1997). South Motor's arguments that certain provisions of the SMS Agreement are, by implication, controlled by Florida law, are both irrelevant, since the provisions of Florida laws referenced by South Motors are irrelevant to this bankruptcy claims procedure, as well as preempted. Further, they are mainly retroactive in nature (and others prospective only), and not constitutionally applicable, because of their date of enactment as compared to when the SMS Agreement was initially established.

320.697 ("Any person who has suffered pecuniary loss or who has been otherwise adversely affected because of a violation by a licensee of ss. 320.60-320.70, notwithstanding the existence of any other remedies under ss. 320.60-320.70, has a cause of action against the licensee for damages and may recover damages therefor in any court of competent jurisdiction in an amount equal to 3 times the pecuniary loss, together with costs and a reasonable attorney's fee to be assessed by the court.") (emphasis added). Where a basis for attorneys' fees exists, such as by contract or under state law, attorneys' fees are properly includable as part of a claim. See Travelers, 549 U.S. at 450-454 (allowing attorneys' fees by reference to state law).

*Opposition*, p. 16, lines 7 - 16.

South Motors continues,

In addition to Florida law, section 13.12 of the Dealer Agreement provides that "[i]f [the Debtor] is required to retain an attorney to enforce its rights under the terms of this Agreement, [the Debtor] shall be entitled to reasonable attorneys' fees." Pursuant to Section 57.105(7) of the Florida Statutes: "If a contract contains a provision allowing attorney's fees to a party when he or she is required to take any action to enforce the contract, the court may also allow reasonable attorney's fees to the other party when that party prevails in any action, whether as plaintiff or defendant, with respect to the contract." Thus, South Motors is entitled to an award of attorneys' fees under both Section 320.697 and Section 57.105(7) of the Florida Statutes and, as such, respectfully requests that this Court enter an order allowing South Motors' claim for attorneys' fees.

Opposition, p. 16, lines 17 - 25.

California has a similar statute, California Civil Code § 1717(a), conferring attorney fee and cost reciprocity on contracting parties.

A party who prevails in a civil action is entitled to recover its costs as a matter of right unless otherwise provided by statute. (*Code Civ. Proc., § 1032, subd.* (b); *see Lincoln v. Schurgin* (1995) 39 Cal.App.4th 100, 104 [45 Cal. Rptr. 2d 874].) However, California law generally requires that a party to a lawsuit pay its own attorney fees, regardless of whether it prevailed in the action. (*Code Civ. Proc.,* § 1021; *Trope v. Katz* (1995) 11 Cal.4th 274, 278–279 [45 Cal. Rptr. 2d 241, 902 P.2d 259].) An exception to this general rule is recognized where a contract, statute or other law specifically authorizes the prevailing party to recover attorney fees. (*Code Civ. Proc., § 1033.5, subd. (a)(10)*; *see also Santisas v. Goodin* (1998) 17 Cal.4th 599, 606 [71 Cal. Rptr. 2d 830, 951 P.2d 399].) Where the recovery of attorney fees is authorized by a contract, the agreement will generally be subject to section 1717(a), which provides in part: "*In any action on a contract,* where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or

to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs." (Italics added.)

*Baldwin Builders v. Coast Plastering Corp.*, 125 Cal. App. 4th 1339, 1343-1344 (Cal. App. 4th Dist. 2005).

The history of recovery of reasonable legal fees and costs within the confines of bankruptcy law disputes is a storied one. In 1991, the Ninth Circuit established the "Fobian Rule" which prevented the award of legal fees and costs, even though provided for within a contract, when parties were litigating issues peculiar to federal bankruptcy law and not basic contract enforcement questions.  Put another way, the Ninth Circuit acknowledged that where a contract or statute provided for an award of attorney fees, a creditor could be entitled to such fees in bankruptcy proceedings, inasmuch as such an award is governed by state law. However, attorney's fees would not be awarded absent bad faith or harassment by the losing party if most of the litigation concerned aspects of bankruptcy law. *In re Fobian*, 951 F.2d 1149 (9th Cir. 1991).

The United States Supreme Court overturned the Fobian Rule in *Travelers Cas. And Sur. Co. v. Pacific Gas and Elec. Co.*, 549 U.S. 443 at 450-454 (2007).

The Fobian rule finds no support in the Bankruptcy Code, either in § 502 or elsewhere. In Fobian, the court did not identify any provision of the Bankruptcy Code as providing support for the new rule. See 951 F.2d, at 1153. Instead, the court cited three of its own prior decisions, *In re Johnson*, 756 F.2d 738 (1985); *In re Coast Trading Co.*, 744 F.2d 686 (1984); and *In re Fulwiler*, 624 F.2d 908 (1980)(per curiam). Significantly, in none of those cases did the court identify any basis for disallowing a contractual claim for attorney's fees incurred litigating issues of federal bankruptcy law. Nor did the court have occasion to do so; in each of those cases, the claim for attorney's fees failed as a matter of state law. See *Johnson*, *supra*, at 741-742; *Coast Trading, supra*, at 693; *Fulwiler, supra*, at 910.n3

*Travelers Cas. & Sur. Co. of Am. v. PG&E*, 549 U.S. 443, 452 (U.S. 2007).

This Court finds that the prevailing party to this claim objection is entitled to its legal fees and costs directly pursuant to the SMS Agreement. The determination of the identity of the prevailing party is guided by the decision of the California Supreme Court in *Hsu v. Abbara*, 9 Cal.4th 863, 876 (1995).

> Accordingly, we hold that in deciding whether there is a "party prevailing on the contract," the trial court is to compare the relief awarded on the contract claim or claims with the parties' demands on those same claims and their litigation objectives as disclosed by the pleadings, trial briefs, opening statements, and similar sources. The prevailing party determination is to be made only upon final resolution of the contract claims and only by "a comparison of the extent to which each party ha[s] succeeded and failed to succeed in its contentions." (*Bank of Idaho v. Pine Avenue Associates* (1982) 137 Cal.App.3d 5, 15, 186 Cal.Rptr. 695.)

*Hsu v. Abbara*, 9 Cal. 4th 863, 876, 891 P.2d 804, 813 (1995).

This decision was recently amplified in the California Court of Appeals Fourth District decision in the *In re Tobacco Cases I*, 2013 Cal. App. LEXIS 398; 2013 WL 1777303, published on May 20, 2013.

> Section 1717, subdivision (a) provides for an award of attorney fees to "the party prevailing on the contract." Under section 1717, subdivision (b)(1), the prevailing party is the party "who recovered a *greater relief* in the action on the contract." (Italics added.) Section 1717 allows "those parties whose litigation success is not fairly disputable to claim attorney fees as a matter of right."

*In re Tobacco Cases I*, 2013 Cal. App. LEXIS 398; 2013 WL 1777303.

South Motors has contended throughout this proceeding that it was entitled to remedies under various Florida motor vehicle statutes, which even Florida has repudiated in a recent previously cited motor vehicle decision *Motorsports of Delray, LLC*. See *Motorsports of Delray, supra*.  South Motors' demands for recovery under the Florida statutes lack legal merit.  Its claims for recovery of common law breach of contract damages also are far short of their proof or legal reasoning.  South Motors has already been paid, prior to this proceeding, the amounts due it under the SMS Agreement itself with respect to reimbursement for automobile inventory,

parts and accessories.  The Court's finding today that South Motors is only entitled to lost

profits of inventory, parts and accessories on hand at the time of the tender, provides South

Motors with a miniscule fraction of its contention of damages.  As the California Supreme Court

instructed,

> "If neither party achieves a complete victory on all the contract claims, it is within
> the discretion of the trial court to determine which party prevailed on the contract
> or whether, on balance, neither party prevailed sufficiently to justify an award of
> attorney fees." (*Scott Co. v. Blount, Inc.* (1999) 20 Cal.4th 1103, 1109, 86
> Cal.Rptr.2d 614, 979 P.2d 974; § 1717, subd. (b)(1).) "[I]n deciding whether there
> is a 'party prevailing on the contract,' the trial court is to compare the relief
> awarded on the contract claim or claims with the parties' demands on those
> same claims and their litigation objectives as disclosed by the pleadings, trial
> briefs, opening statements, and similar sources. The prevailing party
> determination is to be made only upon final resolution of the contract claims and
> only by 'a comparison of the extent to which each party [had] succeeded and
> failed to succeed in its contentions.' " (*Hsu v. Abbara, supra,* 9 Cal.4th at p. 876,
> 39 Cal.Rptr.2d 824, 891 P.2d 804.)

*In re Tobacco Cases I*, 2013 Cal. App. LEXIS 398; 2013 WL 1777303, published on May 20,

2013.

## CONCLUSION

For all of the reasons set out above and orally on the record by the Court, the Debtor's

objection to South Motors Suzuki's Claim Number 520-1, in the amount of $1,595,601 plus

attorney fees and costs is sustained. South Motors' unsecured claim is determined to be

$21,461.00, based on the lost profits as of the date of the tender of the inventory, parts and

accessories, as described above.  Prevailing party attorney fees and costs are awarded to the

Debtor and against South Motors in the amount to be determined following an evidentiary

hearing to be conducted on July 25, 2013 at 1:30 p.m. in Courtroom 5C of the Ronald Reagan

Federal Building and Courthouse, 411 West Fourth Street, Santa Ana, California. Application

for fees and costs, together with supportive declaratory evidence (with respect to the amount

of fees and costs, and not on the ultimate legal issue of prevailing party or award entitlement,

which has already been determined by this decision) shall be filed and served by the Debtor on

all interested parties by no later than twenty one days prior to the hearing.  Any opposition

(with respect to the amount of fees and costs, and not on the ultimate legal issue of prevailing

party or award entitlement, which has already been determined by this decision) shall be filed

and served by South Motors by no later than fourteen (14) days prior to the hearing.  Any reply

may be filed and served by no later than seven (7) days prior to the hearing.  Cross-

examination and re-direct only of declarants shall occur. If declarants are not available for

cross-examination their declaration will be stricken.

      **IT IS SO ORDERED**.

Date: June 4, 2013

Scott C. Clarkson
United States Bankruptcy Judge

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled (*specify*): **ORDER AND MEMORANDUM OPINION ON OBJECTION TO PROOF OF CLAIM NO. 520-1 [DOCKET NO. 1383]** was entered on the date indicated as "Entered" on the first page of this judgment or order and will be served in the manner stated below:

**1.    SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)** B Pursuant to controlling General Orders and LBRs, the foregoing document was served on the following persons by the court via NEF and hyperlink to the judgment or order. As of **6/4/13**, the following persons are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email addresses stated below.

☒ Service    information    continued    on attached page

**2.    SERVED BY THE COURT VIA UNITED STATES MAIL:** A copy of this notice and a true copy of this judgment or order was sent by United States mail, first class, postage prepaid, to the following persons and/or entities at the addresses indicated below:

American Suzuki Motor Corporation
3251 East Imperial Highway
Brea, CA 92821

☐ Service    information    continued    on attached page

**3.    TO BE SERVED BY THE LODGING PARTY**: Within 72 hours after receipt of a copy of this judgment or order which bears an AEntered@ stamp, the party lodging the judgment or order will serve a complete copy bearing an AEntered@ stamp by United States mail, overnight mail, facsimile transmission or email and file a proof of service of the entered order on the following persons and/or entities at the addresses, facsimile transmission numbers, and/or email addresses stated below:

☐ Service    information    continued    on attached page

1.    **SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**

- Allison R Axenrod    allison@claimsrecoveryllc.com
- Jason W Bank    jbank@kerr-russell.com
- Martin R Barash    mbarash@ktbslaw.com, lbogdanoff@ktbslaw.com
- Yelena Bederman    ybederman@omnimgt.com
- Andrew S Bisom    abisom@bisomlaw.com
- Michael J Bujold    Michael.J.Bujold@usdoj.gov
- Frank Cadigan    frank.cadigan@usdoj.gov
- Charles Canter    charles.canter@usdoj.gov
- Linda F Cantor    lcantor@pszjlaw.com, lcantor@pszjlaw.com
- Linda F Cantor    lcantor@pszjlaw.com, lcantor@pszjlaw.com
- George B Cauthen    george.cauthen@nelsonmullins.com, steve.morrison@nelsonmullins.com;jody.bedenbaugh@nelsonmullins.com;steve.mckelvey@nelsonmullins.com;joan.kishline@nelsonmullins.com
- Wendy Chang    wchang@hinshawlaw.com
- Shirley Cho    scho@pszjlaw.com
- Shawn M Christianson    cmcintire@buchalter.com
- Kristen Corbett    kcorbett@omnimgt.com
- Donald H Cram    dhc@severson.com
- Joseph A Eisenberg    jae@jmbm.com, vr@jmbm.com;tgeher@jmbm.com;bt@jmbm.com
- Andrew S Elliott    ase@severson.com
- Scott Ewing    contact@omnimgt.com, sewing@omnimgt.com;katie@omnimgt.com
- Scott Ewing    contact@omnimgt.com, sewing@omnimgt.com;katie@omnimgt.com
- William A Frazell    bk-bfrazell@texasattorneygeneral.gov
- Donald L Gaffney    dgaffney@swlaw.com
- Amir Gamliel    agamliel@perkinscoie.com, cmallahi@perkinscoie.com
- Duane M Geck    dmg@severson.com
- Michael I Goldberg    info@sonarcredit.com
- Richard H Golubow    rgolubow@winthropcouchot.com, pj@winthropcouchot.com;vcorbin@winthropcouchot.com
- Leon B Gordon    othercourts@mvbalaw.com
- Debra I Grassgreen    dgrassgreen@pszjjw.com
- Michael J Hauser    michael.hauser@usdoj.gov
- Eric M Heller    eric.m.heller@irscounsel.treas.gov
- Matthew Heyn    mheyn@ktbslaw.com
- Desmond J Hinds    dhinds@hinshawlaw.com, mpotter@hinshawlaw.com
- John J Immordino    john.immordino@wilsonelser.com, raquel.burgess@wilsonelser.com
- Steven J Kahn    skahn@pszyjw.com
- Teddy M Kapur    tkapur@pszjlaw.com
- Samuel M Kidder    skidder@ktbslaw.com
- Jonathan J Kim    jkim@pszjlaw.com, jkim@pszjlaw.com
- Andy Kong    Kong.Andy@ArentFox.com
- David S Kupetz    dkupetz@sulmeyerlaw.com, jbartlett@sulmeyerlaw.com
- Kristin R Lamar    nclgign@hotmail.com
- Kenneth T Law    ken@bbslaw.com
- Kenneth T Law    ken@bbslaw.com
- John W Lucas    jlucas@pszjlaw.com, ocarpio@pszjlaw.com
- Kerri A Lyman    klyman@irell.com
- Kerri A Lyman    klyman@irell.com
- Gabriel R Macconaill    gmacconaill@sidley.com
- Kathleen P March    kmarch@bkylawfirm.com, kmarch3@sbcglobal.net
- Michael P McMahon    mmcmahon@irell.com, mick.p.mcmahon@gmail.com
- Laura A Meyerson    laura.meyerson@sce.com
- Christopher Minier    becky@ringstadlaw.com
- Mike D Neue    mneue@thelobelfirm.com, jmattiace@thelobelfirm.com;nlockwood@thelobelfirm.com
- Valerie B Peo    vpeo@schnader.com, mpadilla@schnader.com
- David M Poitras    dpoitras@jmbm.com, bt@jmbm.com
- Robert S Prince    rprince@kmclaw.com, squilter@kmclaw.com
- Jeffrey M. Reisner    jreisner@irell.com
- Jeffrey M. Reisner    jreisner@irell.com
- James S Riley    tgarza@sierrafunds.com
- Jason H Rosell    jrosell@pszjlaw.com, oginsburg@pszjlaw.com
- Susan K Seflin    sseflin@wrslawyers.com
- Esperanza Segarra    esegarra@hinshawlaw.com, swechsler@hinshawlaw.com
- Alan D Smith    adsmith@perkinscoie.com
- James Stang    jstang@pszjlaw.com
- Howard Steinberg    steinbergh@gtlaw.com, laik@gtlaw.com;LALitDock@GTLAW.com
- Barry Sullivan    bsullivan@sacfirm.com
- Jessica Taran    jtaran@wilkauslander.com
- Charles M Tatelbaum    ctatelbaum@hinshawlaw.com, csmith@hinshawlaw.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
- Andy C Warshaw    awarshaw@lawcenter.com, mstevens@lawcenter.com
- Jonathan M Weiss    jweiss@ktbslaw.com
- Joseph M Welch    jwelch@buchalter.com, dcyrankowski@buchalter.com;docket@buchalter.com;bkgroup@buchalter.com
- Elizabeth Weller    dallas.bankruptcy@publicans.com
- Judith A Whitehouse    jwhitehouse@schwabe.com, dmillan@schwabe.com;centraldocket@schwabe.com
- Dean A Ziehl    dziehl@pszjlaw.com, dziehl@pszjlaw.com
- Dean A Ziehl    dziehl@pszjlaw.com, dziehl@pszjlaw.com